**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BRYSON CITY DIVISION**

**CIVIL CASE NO. 2:08cv25**

| | | |
|---|---|---|
| **BLUE RIDGE PUBLIC SAFETY, INC.,** | ) | |
| **SAPPHIRE VALLEY PUBLIC SAFETY,** | ) | |
| **INC., d/b/a BLUE RIDGE PUBLIC** | ) | |
| **SAFETY, and DAVID H. FINN,** | ) | |
| **Individually and as President of Blue** | ) | |
| **Ridge Public Safety, Inc. and of** | ) | |
| **Sapphire Valley Public Safety, Inc.,** | ) | |
| **d/b/a Blue Ridge Public Safety,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| **JAMES M. ASHE, Individually and as** | ) | |
| **Sheriff of the Jackson County** | ) | |
| **Sheriff's Office and JACKSON** | ) | |
| **COUNTY SHERIFF'S OFFICE,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on the Defendants James M. Ashe and Jackson County Sheriff's Office's Motion for Stay of Proceedings Pending Appeal [Doc. 75]. For the reasons stated herein, the Court denies the motion.

1

# PROCEDURAL HISTORY

On October 15, 2007, the Plaintiffs Blue Ridge Public Safety, Inc. (Blue Ridge), Sapphire Valley Public Safety, Inc. (Sapphire Valley), and David H. Finn (Finn) initiated an action against the Defendants in state court alleging claims for tortious interference with contract and tortious interference with prospective economic advantage. [Doc. 1-3]. The parties litigated for almost one year before the Plaintiffs received permission on September 8, 2008 to file an amended complaint. [Doc. 1-1]. That complaint added a claim pursuant to 42 U.S.C. §1983 for the unlawful deprivation of civil rights. [Id.]. The Defendants filed a timely notice of removal to this Court asserting federal question jurisdiction. [Doc. 1]; 28 U.S.C. §1446(b) ("If a case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading ... from which it may first be ascertained that the case is one which is or has become removable[.]").

On June 1, 2009, the Defendants filed a motion for summary judgment. [Doc. 11]. Pursuant to 28 U.S.C. § 636(b) and the Standing Orders of Designation of this Court, United States Magistrate Judge Dennis L. Howell was designated to consider the Defendants' motion for summary judgment

and to submit recommendations for its disposition. After response and reply, the Magistrate Judge conducted a hearing on July 23, 2009. He also required the submission of a complete transcript of any deposition on which either party relied. The parties subsequently filed a Stipulation in which they agreed that each of the exhibits attached to any pleading "is genuine and, if relevant and material, may be received in evidence without further identification or proof."[1] [Doc. 65].

On September 30, 2009, the Magistrate Judge filed a Memorandum and Recommendation in which he recommended that the motion for summary judgment be granted. [Doc. 66]. The Plaintiff filed timely objections to the recommendation. [Doc. 67]. The Plaintiffs' primary objection is to the Magistrate Judge's handling of the facts which, they claim, he failed to view in the light most favorable to them as the non-moving parties. "In sum, [they argue,] it appears as if the Magistrate Judge has acted as the ultimate finder of fact in derogation of the Plaintiffs' right to trial." [Doc. 67, at 2].

On March 30, 2010, the Court conducted a further hearing on the motion for summary judgment. During that hearing, the Court stated on the record numerous issues wherein there appeared to be conflicting evidence and

---

[1]The Court construes this stipulation as having waived hearsay objections for the purposes of the consideration of the Motion for Summary Judgment.

provided the parties an opportunity to address those issues. In so doing, the Court conducted a *de novo* review of the factual allegations and respective forecasts of evidence of the parties. At the conclusion of the hearing, the Court announced that it respectfully disagreed with the Magistrate Judge and found genuine issues of material fact that render the case unsuitable for disposition by summary judgment, and based thereon the Court announced the denial of the motion.[2] The Court also advised the parties that prior to the trial of the case, the issue of whether Jackson County should be a named defendant must be addressed. The Court entered on the docket the denial of the motion by the entry of a text order on March 31, 2010.

On April 20, 2010, the Defendants filed a notice of appeal "from the text-only Order" denying their motion for summary judgment. [Doc. 74]. The Notice of Appeal makes no reference to the oral rulings of the Court on March 30, 2010. On the same date, the Defendants moved to stay the trial proceedings pending the completion of the appeal. [Doc. 75].

---

[2]As will be noted *infra*, the parties agreed in their pleadings that the Plaintiff's substantive due process claim must be dismissed. The Plaintiffs also conceded that they did not state a procedural due process claim.

## THE MOTION TO STAY PENDING APPEAL

As grounds for the motion, the Defendants argue that

> [f]ollowing a hearing on March 30, 2010, Judge Martin Reidinger entered a "text-only" Order denying defendants' Motion for Summary Judgment. This text-only Order was entered on March 30, 2010 and entered and filed on March 31, 2010. Defendants filed a Notice of Appeal from Judge Reidinger's Order to the United States Court of Appeals for the Fourth Circuit on April 20, 2010. Defendants contend that said ruling is immediately appealable as it pertains to questions of law regarding qualified immunity. With regards to plaintiffs' claims that are not subject to the issue of qualified immunity, defendants contend that said claims are still subject to review by the Fourth Circuit at this time as collateral orders and/or pursuant to the doctrine of pendent appellate jurisdiction.

[Doc. 75, at 2].

The Defendants references to a "text-only Order" curiously fail to acknowledge the Court's oral rulings on the record at the conclusion of the hearing. See, *e.g.*, <u>Culosi v. Bullock</u>, 596 F.3d 195, 200 (4th Cir. 2010) (recognizing that the district court denied summary judgment for the reasons stated in open court). In the motion to stay, the Defendants argue the issue of qualified immunity is immediately appealable as a question of law and, thus, this Court should stay all further proceedings pending appeal. The Defendants nonetheless recognize that the denial of a motion for summary judgment is not a final order subject to appeal. They "contend" that the Fourth

Circuit could "review" that denial but have not moved for certification of an interlocutory appeal. See, 28 U.S.C. §1292(b).

If the Defendants are not entitled to an immediate appeal of the issue of qualified immunity, there is no reason to stay this action. As to qualified immunity,

> [t]he inquiry into qualified immunity starts with a threshold question: taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? If the court finds there is no violation of a constitutional right, the inquiry ends there and the officer is entitled to summary judgment. If a potential violation is shown, the next step is to ask whether the right was clearly established. Qualified immunity is abrogated only when the right that the officer is alleged to have violated was a "clearly established" right at the time of the violation. The Supreme Court has recently freed [lower courts] to consider these issues in any sequence. Pearson v. Callahan, ___ U.S. ___, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).
>
> ...
>
> [T]he Supreme Court and [the Fourth Circuit] have made clear "that a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." "In other words, [the Fourth Circuit] possess[es] no jurisdiction over a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the facts actually occurred, but [it does] have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them."

Culosi, 596 F.3d at 201 n.3 (other citations omitted).

As noted during the hearing, the denial of summary judgment in this matter is fact driven.

> [T]here exist[s] in this case genuine disputes of material fact and th[e] resolution of such disputes at trial [is] necessary before the legal issue of [Ashe's] entitlement to qualified immunity [may] be determined. [The Court's] comments "in open court" leave little doubt as to its reasoning: "It's a very close case. ... Credibility of the witnesses is clearly an issue that runs through this, and quite frankly, this will to a significant degree rely upon the credibility of [Ashe]." Thus, it is clear that [the Court] found that whether [Ashe retaliated against Finn as a result of his protected speech is] a factual issue for the jury at trial.

Id., at 201-02. As set forth below, the genuine issues of material fact regarding the Plaintiffs' substantive claims are inextricably intertwined with the issue of whether the Defendant is entitled to qualified immunity. For this reason the Defendant has no right to an immediate appeal, and a stay is not warranted.

**The Standard of Review Applied to the Magistrate Judge's Decision.**

The District Court "shall make a *de novo* determination of those portions of the [Magistrate Judge's] report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. §636(b)(1)(C). The district judge may accept, reject, or modify the findings or recommendations and may, but is not required to, receive further evidence. Id.

A party objecting to a Magistrate Judge's Memorandum and Recommendation "must specifically identify the portions of the [Memorandum] and Recommendation to which objections are made and the basis for such objections." Thomas v. Westinghouse Savannah River Co., 21 F.Supp.2d 551, 560 (D.S.C. 1997), *affirmed in part, dismissed in part* 162 F.3d 1155 (4th Cir. 1998). As noted above, the Plaintiff objects to summary judgment, claiming the factual contentions warrant a jury determination.

> Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003), *certiorari denied* 541 U.S. 1042, 124 S.Ct. 2171, 158 L.Ed.2d 732 (2004) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), *certiorari denied* 513 U.S. 814, 115 S.Ct. 68, 130 L.Ed.2d 24 (1994), *citing* Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact."  Bouchat, 346 F.3d at 522, *citing* Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist.  Id.

Nonetheless, in considering the facts for the purposes of a summary judgment motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party.  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  In so viewing the evidence, it is noted that "summary judgment is not appropriate when there are conflicting versions of the events giving rise to the action, or when there is no conflict about the events that occurred, but the legal significance of those events is determined by a reasonable person test."  Griffith v. Glen Wood Co., Inc., 184 N.C.App. 206, 210, 646 S.E.2d 550 (2007) (citation omitted); *accord*, Krider v. Marshall, 11 Fed.Appx. 217, 218 (4th Cir. 2001), *citing* Anderson, 477 U.S. at 250 (district court should not resolve conflicting versions of events on summary judgment).  It is also inappropriate

"when issues such as motive, intent, and other subjective feelings and reactions are material, when the evidence presented is subject to conflicting interpretations, or where reasonable [persons] might differ as to the significance of any particular piece of evidence." Gregorino v. Charlotte-Mecklenburg Hosp. Authority, 121 N.C.App. 593, 595, 468 S.E.2d 432 (1996), *citing* Smith v. Currie, 40 N.C.App. 739, 742, 253 S.E.2d 645, *review denied* 297 N.C. 612, 257 S.E.2d 219 (1979); *accord*, Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996) (district court improperly resolved an inference from the evidence in a light most favorable to the moving party).

**The Essential Elements of the Causes of Action Alleged.**

The Plaintiffs' first cause of action is for tortious interference with contracts. It is alleged that the Defendants interfered with an offer to purchase Blue Ridge's subsidiary, Sapphire Valley, and interfered with Blue Ridge's existing contracts with customers. [Doc. 1-1, at 1-7, 9-10].

The essential elements of a cause of action for tortious interference with contract are:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person;

> (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in so doing acts without justification; (5) resulting in actual damage to plaintiff.

Holleman v. Aiken, 193 N.C.App. 484, 589-90, 668 S.E.2d 579 (2008), *quoting*

Holroyd v.Montgomery County, 167 N.C.App. 539, 546, 606 S.E.2d 353 (2004), *review denied* 359 N.C. 631, 613 S.E.2d 690 (2005).

The Plaintiffs' second cause of action against the Defendants is for tortious interference with prospective economic advantage. [Doc. 1-1, at 1-8, 10-12].

> The North Carolina Supreme Court has held that claims for tortious interference with prospective economic advantage still prevail, stating that "unlawful interference with the freedom of contract is actionable, whether it consists in maliciously procuring breach of a contract, or in preventing the making of a contract when this is done, not in the legitimate exercise of defendant's own right, but with design to injure the plaintiff, or gaining some advantage at his expense."

Robinson, Bradshaw & Hinson, P.A. v. Smith, 129 N.C.App. 305, 318-19, 498 S.E.2d 841 (1998), *review denied* 348 N.C. 695, 511 S.E.2d 649 (1998), *quoting* Owens v. Pepsi Cola Bottling Co. of Hickory, N.C., Inc., 330 N.C. 666, 680, 412 S.E.2d 636 (1992).

Despite the doctrine of governmental immunity for public officers acting in their official capacities, Defendant Ashe may "remain *personally* liable for

any actions which may have been corrupt, malicious or perpetrated outside and beyond the scope of official duties." Beck v. City of Durham, 154 N.C.App. 221, 230, 573 S.E.2d 183 (2002), *quoting* Locus v. Fayetteville State University, 102 N.C.App. 522, 526, 402 S.E.2d 862 (1991) (emphasis in original).  Moreover, where "'the plaintiff alleges an intentional tort claim, a determination [of governmental immunity] is unnecessary since, in such cases, neither a public official nor a public employee is immunized from suit in his individual capacity.'" Id., *quoting* Wells v. North Carolina Dept. of Correction, 152 N.C.App. 307, 320, 567 S.Ed.2d 803 (2002).  Both of these claims are intentional tort claims and thus no governmental immunity is available. Id. (tortious interference with contract and prospective economic advantage are intentional torts); *accord*, Free Spirit Aviation, Inc. v. Rutherford Airport Authority, 191 N.C.App. 581, 586, 664 S.E.2d 8 (2008).

The third cause of action is brought pursuant 42 U.S.C. §1983 which makes actionable conduct by a defendant acting under color of state law which deprives a plaintiff of rights secured by the United States Constitution and/or federal law.  The Plaintiffs claim that the Defendants retaliated against them for their exercise of political speech in support of legislation which was opposed by Defendant Ashe.

It is well settled that "[t]he First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." ... [The Fourth Circuit] ha[s] held that a First Amendment retaliation claim brought under 42 U.S.C. §1983 must include three elements:

> *First*, the plaintiff must demonstrate that his or her speech was protected. *Second*, the plaintiff must demonstrate that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech. *Third*, the plaintiff must demonstrate that a causal relationship exists between [the] speech and the defendant's retaliatory action.

With respect to the second prong, a plaintiff must show that the retaliatory conduct "would likely deter a person of ordinary firmness from the exercise of First Amendment rights."

Camastro v. City of Wheeling, 332 Fed.Appx. 125, 127-28 (4th Cir. 2009), *quoting* Suarez Corp. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000) and Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (emphasis in original). In this case, the parties have conceded that Finn's speech in support of proposed legislation was protected speech.

Plaintiffs' also alleged a substantive due process claim pursuant to §1983 based on the alleged deprivation of property interests in the contract for the sale of the subsidiary and continued contractual relationships with customers.

> To establish a violation of substantive due process, [Plaintiffs] must "demonstrate (1) that they had property or a property interest; (2) that the state [actor] deprived them of this property or property interest; and (3) that the state[] [actor's] action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency."

MLC Automotive, LLC v. Town of Southern Pines, 532 F.3d 269, 281 (4th Cir. 2008).

However, the "substantive due process claim fully overlaps [the] free speech claim." Edwards v. City of Goldsboro, 178 F.3d 231, 248 n.11 (4th Cir. 1999).

> Because the First Amendment "provides an explicit textual source of constitutional protection against" the particular sort of government behavior of which [Plaintiffs] complain[] in [the] substantive due process claim, the First Amendment, "not the more generalized notion of substantive due process, must be the guide for analyzing" [the] claim.

Id., quoting County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); accord, Willis v. Town of Marshall, N.C., 426 F.3d 251, 266 (4th Cir. 2005). As a result, the substantive due process claim must be dismissed.[3]

---

[3]In fact, the Plaintiffs do not make a specific objection to this portion of the Magistrate Judge's recommendation that the due process claim is subsumed by the protected speech claim. [Doc. 67, at 32-33]. Plaintiffs also clarify that they do not state a procedural due process claim. [Id.].

**Issues of Fact and the Elements of the Claims.**

In the usual case, the Court would first set forth uncontroverted facts followed by a discussion of the law applied thereto. This case, however, presents a fact-laden scenario in which the motive, intent, subjective feelings and reactions of the parties and others are subject to conflicting interpretations, and the forecast of evidence is subject to differing inferences. Griffith, 184 N.C.App. at 210; Gregorino, 121 N.C.App. 593 at 433-34. There are numerous examples of conflicting versions of events and reasonable persons could differ as to the significance of numerous items of evidence. Id. Moreover, Ashe's intent and motives are elements of the causes of action at issue, making summary judgment inappropriate. Robinson, Bradshaw & Hinson v. Smith, 129 N.C.App. at 318-320. As a result, the Court will set forth the material factual discrepancies in the forecast of evidence which require the denial of summary judgment.

The parties do not dispute the following facts. Blue Ridge is a North Carolina corporation whose president and chief executive officer is David Finn (Finn). [Doc. 1-1, at 1; Doc. 59-3, at 1]. Sapphire Valley, a North Carolina corporation, is the wholly owned subsidiary of Blue Ridge. [Doc. 1-1, at 1]. Through Sapphire Valley, Blue Ridge provides contract private protective and

law enforcement services pursuant to N.C.G.S. §§74C-1, *et. seq.*, to individuals, businesses, homeowners' associations and real estate developments. [Id., at 2]. Blue Ridge is licensed by the North Carolina Department of Justice Private Protective Services Board (PPSB) and is certified by the North Carolina Attorney General as a Special Police Agency. [Id.]. The services provided by Blue Ridge and Sapphire Valley are pursuant to written contracts, which typically are for five years. [Id.; Deposition of David H. Finn, at 101].[4] In February 2008, at the time Finn was deposed in this case, Sapphire Valley had between three hundred and four hundred contracts in three counties, Jackson, Macon and Transylvania. [Id., at 113-14].

Defendant Ashe is the Sheriff of Jackson County, having been first elected in 2002 and re-elected in 2006. [Doc. 59-4, at 1; Deposition Transcript of James Ashe, at 4]. At the relevant times alleged in the Complaint, Ashe also served as the co-chairman of the Legislative Committee of the Sheriff's Association, a private group, and was appointed to be a member of the PPSB, which is a public board and a state agency. [Id., at 100].

In 2006, Finn was the president of the Company Police Association of

---

[4]The parties attached incomplete portions of the deposition transcripts to their pleadings. Those portions are included in the docket of the action. The Magistrate Judge required the parties to submit complete copies of the deposition transcripts. Where the complete copies are referenced, the Court will so denote.

North Carolina. [Doc. 1-1, at 2]. In that role, he lobbied for and began to raise funds to support proposed legislation pending before the North Carolina General Assembly. [Id.]. The legislation would have expanded the territorial jurisdiction of state company police. Ashe openly opposed this legislation. [Ashe Deposition, at 65-69]. In August 2006, Finn sent Ashe a letter in which he described his support for the proposed legislation. [Id., at 68]. After that time, Ashe stopped providing backup support for Blue Ridge/Sapphire Valley officers. [Id.].

The remaining facts are disputed by the parties. In addition to disputing the actual events, the parties dispute the inferences which may or may not be drawn therefrom. Unless otherwise stated, the facts set forth hereafter are taken in the light most favorable to the non-moving parties, the Plaintiffs.

On May 31, 2007, Blue Ridge received an offer from John Hale to purchase the business for the sum of $1,500,000. [Doc. 59-13]. The closing date set for the sale was July 1, 2007. [Id.]. John Hale's *bona fide* offer of May 31, 2007 was accepted by Blue Ridge on that same date. [Doc. 13].

On July 17, 2007, Hale wrote to Finn as follows:

[A]t this time, I find it necessary to rescind my offer effective today's date. I do so regretfully, but with the situation as it is now, I feel I must. If at some point in the future the matters that are currently under investigation by various state agencies are

favorably resolved, I would appreciate being given the opportunity to begin the negotiation process again and re-evaluate the condition of your business at that time.

[Doc. 59-19].

The events leading up to this date are relevant to the elements of each cause of action.  As early as October 2006, complaints against Blue Ridge had been filed with the state PPSB, of which Ashe was a member, by Mark Seifert, an attorney in Cary, North Carolina who represented the Committee of Sapphire Homeowners (COSH) and Sapphire and Cashiers Concerned Citizens (SACCC).[5] [Doc. 59-18, at 2; Doc. 59-29, at 35].  Seifert testified that these two organizations were formed "to obtain proper regulatory oversight over" Blue Ridge and its subsidiary, Sapphire Valley. [Id., at 32].

Beginning in the fall of 2006 and acting on behalf of these two organizations, Seifert filed between eight and twelve complaints against Blue Ridge with the following agencies: PPSB, Alarm Services Licensing Board, Company Police Administrator, and State Bureau of Investigation (SBI). [59-18, at 5]; [Deposition Transcript of Mark Seiffert, at 22-23].  In 2008, after about sixteen months of investigation, the state board, PPSB, found only three administrative violations. [Id.].  The violations were of a minor nature.  The

---

[5] Both Sapphire and Cashiers are in Jackson County.

timing of the complaints and the fact that no major violations were found support an inference that Seifert and/or his clients had a vendetta against Plaintiffs. The issue is whether the forecast of evidence supports an inference that Ashe was similarly motivated.

Seifert, who describes himself as having a background in business and administrative law, had a fairly extensive "email relationship" with Ashe while these complaints were pending. [Deposition Transcript of Mark Seifert, at 1-14]; [Doc. 59-29]. The copies of the emails submitted in evidence, which began in April 2007, show that Seifert forwarded to Ashe voluminous emails and attachments thereto relating to Finn, Blue Ridge and the complaints which Seifert filed with the PPSB. [Id.]. In one such email, he encourages Ashe to attend a May 2007 meeting of presidents of homeowners' associations.[6] [Doc. 59-29, at 5]. Noting that it was "very important for you to attend," Seifert posited that "Finn is making his case and you need to counterbalance it and show the Sheriff's Department Flag at this upcoming event." [Id.]. Seifert also provided information to the local news media about the complaints and PPSB investigation. [Doc. 59-29, at 6]. In May 2007, the reporter took Seifert to task for providing incorrect information, noting that he had gotten his information

---

[6]The bulk of Blue Ridge's business was with homeowners' associations.

from Seifert's "letter (the so-called anonymous flyer), plus what Sheriff Ashe told me." [Id.]. This supports an inference that Ashe spoke to the reporter on at least this occasion about Finn, Blue Ridge and the complaints pending before the PPSB.

The PPSB made numerous requests of Seifert to identify the membership of SACCC and COSH.[7] [Id., at 76]. In June 2007, Seifert copied Ashe on an email in which he reported that the agency was about to "come down hard on us" for refusing to do so. [Id.]. Seifert copied Ashe with communications he had with the agencies, including the PPSB, during the investigation of the complaints which Seifert filed on behalf of SACCC and COSH. [Id., at 70-82]. Throughout this time, Ashe served on the PPSB and Seifert was aware of his appointment to the board. [Id., at 82, 97]. In April 2007, he met Ashe in Wilmington at a PPSB meeting during which the grievance committee of the PPSB was considering a complaint against Blue Ridge. [Id., at 100]. Ashe did not serve on the grievance committee but he was present at the PPSB meeting where the complaint was being considered.

The emails also show that Seifert thanked Ashe for making introductions to local and state politicians. [Id., at 3]. In June 2007, Ashe wrote to Seifert

_____

[7]This raises an inference as to whether the Board was attempting to uncover a personal vendetta against Finn.

advising that he had arranged a meeting for Seifert through a local politician. [Id.]. Ashe wrote, "I told him about promoting an investigation. I think this needs to [be] said in your conversation." [Id.]. A reasonable person could conclude that Ashe was actively encouraging investigations of Finn and Blue Ridge, investigations which led to the recision of one or more contracts. Blankenship v. Manchin, 471 F.3d 523, 525-530 (4th Cir. 2006) (the actual regulatory scrutiny sustained strongly supports interpreting the public official's statements and conduct as retaliatory).

The forecast of evidence also shows Ashe working in concert with Seifert in other ways. In July 2007, Seifert wanted to get in touch with an individual who had been arrested by Blue Ridge. [Id., at 1]. He emailed Ashe for the information and Ashe responded, "Give me your fax and I will send you paper work on arrest." [Id.]. Ashe included the individual's name, address and telephone number in the body of the email. [Id.]. Seifert routinely received such information from Ashe and then contacted the individuals in an attempt to uncover allegedly abusive conduct by Finn and his business. [Id.]. Although it may not have been illegal for Ashe to provide such information, within the context of all the evidence in this case, a jury could reasonably infer that he did so to promote regulatory investigations and complaints against

Finn and Blue Ridge. <u>Blankenship</u>, 471 F.3d at 529-30 ("That Manchin activated the 'punitive machinery of the government' against Massey supports our reading the Governor's remarks as threats, rather than predictions."). Again, Ashe's motives and intentions behind this conduct are essential to the elements of the causes of action, thus making the case inappropriate for disposition on summary judgment.

In July 2007, Seifert inquired of Ashe as to why a state magistrate in Jackson County had refused to issue an assault arrest warrant against Finn and why the SBI agent in charge of an investigation was dragging his feet. [Deposition Transcript of Mark Seifert, at 70-72]. Ashe responded that the agent would be conducting additional interviews, including an interview of Finn the following Wednesday, thus showing that he was aware of the details of the investigation and was willing to provide that information to Seifert. [<u>Id</u>.].

In addition to emails, telephone records show extensive contact, approximately 127 calls, between Seifert and Ashe. [Doc. 60]. Seifert freely admitted that he made numerous written requests to Ashe for information related to arrest records and incident reports involving Blue Ridge. [Deposition Transcript of Mark Seifert, at 36-41, 53]. Seiffert also admitted that Ashe provided him with copies of incident reports involving Blue Ridge so

that Seifert could investigate "possible abuses by Blue Ridge." [Id., at 41];

Blankenship, 471 F.3d at 526-27 (use of government resources to cause regulatory scrutiny is evidence of retaliation). Seifert, who admitted that he received client referrals from Ashe, testified that he was "always looking for information about Mr. Finn and his activities." [Seifert Deposition, at 42-27]. In fact, the only reason for his telephone calls with Ashe was "to keep Sheriff Ashe up to speed on what I was doing and to find out from him anything that he–his department had become aware of that might be of interest to these agencies." [Id., at 58-59]. Each time Seifert filed a complaint against Blue Ridge, he would inform Ashe and discuss it with Ashe. [Id.].

Seifert openly admitted that his conduct was an attempt to get Finn's certification as a law enforcement officer revoked and to disqualify Finn as a qualifying agent for Blue Ridge. [Id., at 60]. The effect of losing certification and qualification would have been that Finn could no longer run his business. [Id.]. Indeed, Seifert acknowledged that he was trying to "shut down" Blue Ridge and that he had communicated this wish to Ashe. [Id., at 61, 103]. His relationship with Ashe continued after Seifert disclosed this desire. [Id., at 116]. Likewise, Ashe continued to provide incident and arrest reports and to refer clients to Seifert at a time when he knew of Seifert's intention to ruin

Finn's business. It is undisputed that Ashe knew of Blue Ridge's many contracts with homeowners' associations in Jackson County. Indeed, reasonable jurors could conclude that Ashe acted in concert with Seifert in order to further Seifert's stated goal of damaging Finn and Blue Ridge by filing numerous complaints with the state regulatory agency. Reasonable jurors could also conclude that these investigations had the desired impact of interfering with continuing negotiations for a contract and/or a contract for the sale of Blue Ridge as well as existing customers' contracts.

Seifert also admitted that on behalf of COSH and SACCC, his private investigator obtained a copy of Finn's application for employment with the Coral Gables, Florida police department which had attached to it Finn's confidential military record. [Id., at 61-63]. Seifert refused to explain how the investigator had obtained the confidential documents; however, he admitted that he discussed both documents with Ashe. [Id.]. It is telling that although Blue Ridge also did business in two other counties, Seifert had no communication with the sheriffs of those counties concerning Finn or Blue Ridge. [Id., a 120]. A reasonable jury could infer from this that Ashe intentionally acted through Seifert to impair the reputation of Finn and Blue Ridge.

In March 2007, Ashe held a meeting with the managers of local property owners' associations. [Doc. 59-22]. As noted, it is undisputed that Ashe was aware that the majority of Blue Ridge's business came from such associations. The meeting was attended by Darrell Wood who provided an affidavit in which he stated that

> [t]he conversation was about David Finn and his company. The Sheriff said that he was on the Board of the state agency that regulates Mr. Finn's business. The Sheriff also said that he was very much opposed to some legislation that Mr. Finn was trying to get passed that would give his company the authority to stop people on public roads. Mr. McAllister [of SACCC] ... asked questions about the legality of Mr. Finn's combined security and company police business. The Sheriff said a complaint had been filed against Mr. Finn. The Sheriff gave Mr. McAllister the name of the state senator who he could write or e-mail to voice opposition to the legislation. The Sheriff also said that if we knew of any complaints against Mr. Finn to let him know, and he would see to it that the complaints were forwarded to the people who were investigating Mr. Finn. ... In hindsight, I wish I had not attended this meeting because my being there might have been misinterpreted as lending support or credibility to Mr. McAllister's longstanding personal complaints about Mr. Finn and his company.

[Doc. 59-22].

At the time of this meeting, the investigations were pending and although Ashe purportedly was not participating in those investigations, Wood has testified that Ashe actively solicited complaints against Finn which he could present to the PPSB. Blankenship, 471 F.3d at 529 ("It is a reasonable

reading of [Ashe's] remarks to view them as a threat of imminent adverse regulatory action" in retaliation for Finn's support of proposed legislation.). This was done in the same meeting at which Ashe acknowledged his opposition to the legislation promoted by Finn. Despite the fact that Ashe claimed he would not participate in the investigation of complaints against Finn and Blue Ridge, Ashe actively recruited such complaints, remained involved with Seifert and provided information to Seifert on which such complaints were based. [Deposition Transcript of Seifert, at 100-102]. Ashe even referred clients to Seifert during this time, clients who wished to bring actions against Blue Ridge and/or Finn. [Id., at 99-100]. In all these things, Ashe acted on behalf of the Sheriff's Department and as sheriff, forumulated the Department's customs and course of conduct. Reasonable jurors could find Ashe's conduct to be retaliation against Finn for his support of the proposed legislation, and find his comments to be encouraging the property managers (1) to file complaints against Finn; (2) to inform Ashe of such complaints so that he could file them; and/or (3) to break any contracts they may have had with Blue Ridge due to the pending regulatory investigations. Blankenship, 471 F.3d at 529.

    In March 2007, Tim O'Brien worked for Blue Ridge in a supervisory

capacity over the other officers. [Deposition Transcript of Timothy O'Brien, at 26]. O'Brien was in the parking lot outside of the Jackson County Administration building when he was approached by Ashe. [Id., at 27]. O'Brien testified that Ashe said

> why didn't I buy the company out, Blue Ridge Public Safety, and send Dave Finn home because he tended to ruffle feathers and rub people the wrong way. ... He told me things were going to get nasty for Blue Ridge Public Safety and David Finn. ... He didn't appreciate Dave Finn making derogatory comments about the sheriff. ... During that conversation there was a lot of talk about things are going to happen, events are going to happen coming up to Blue Ridge Public Safety, and that I would need to  –  I would be involved in it, and I would have to do a check on my ethics. ... He stated to me that he had worked for someone  –  I can only assume he referred to the prior sheriff  –  whose ethics were not good, and that he thought I was under the same situation working for someone whose ethics were not good.

[Id., at 27-28]. O'Brien testified that this conversation occurred the same day as the meeting Ashe had with property managers in the area. [Id., at 34]. A jury could reasonably conclude from these comments that Ashe, individually and as the Sheriff, was threatening Blue Ridge and Finn and that he was accusing Finn of unethical conduct. Blankenship, 471 F.3d at 529 ("It is a reasonable reading of [Ashe's] remarks to view them as a threat ..." rather than a prediction.). O'Brien also testified that Blue Ridge lost approximately ten contracts between March 2007 and July 2008. [Id., at 36-47]. Numerous

individuals asked Blue Ridge why it was receiving so much bad publicity and why so many investigations were on-going. [Id., at 50].

O'Brien acknowledged that he was aware of Hale's contract to purchase Blue Ridge. O'Brien told Ed Baynard, who worked for the Jackson County Sheriff's Department, that Hale had entered into the contract. [Id., at 64]. O'Brien testified that the following individuals who originally worked for Blue Ridge and later for the Sheriff knew that Hale had entered into a contract to purchase Blue Ridge: Chris Watson, Ben Clark, Dale Blankenship, John Autry, William Reid, and Christy Jenkins. [Id., at 65-66].

O'Brien had a conversation with Hale after the offer to purchase Blue Ridge was rescinded. [Id., at 62]. Hale told O'Brien that there was "[j]ust too much going on with the sheriff and the complaints" and as a result, the business was not something he wanted to "get into the middle of right now." [Id.]. Hale also mentioned the bad press that Blue Ridge was receiving as a reason for rescinding the contract. [Id.].

Hale also provided an affidavit in which he made the following statements:

> While waiting to hear from my attorney [about the closing of the business purchase], several events occurred which, in combination, caused my associates and I to rescind the offer to purchase David Finn's company. There was a front page

newspaper article in the local paper which said that David Finn's company was under investigation by the state. ... This news was, of course, of great concern to me and my associates as we were about to purchase a company for $1,500,000.00 that, according to the article, was about to be put out of business.

...

I began to hear rumors that David Finn and his company were under investigation by the SBI. David Finn's company was under investigation for numerous complaints before the PPS Board. ... There was also a rumor that David Finn was going to be arrested by Sheriff Ashe. Finally, it was apparent that Sheriff Ashe had a vendetta against David Finn and his company. I felt that these events made it impossible for me to purchase the company.

[Doc. 64, at 2].

Annette Baynard, who works for Blue Ridge, testified that it was common knowledge in the community that Blue Ridge was for sale because Finn wanted to retire and also common knowledge that Hale was interested in buying it. [Deposition Transcript of Annette Baynard, at 12-15]. She testified that the business had lost many contracts in the two year period prior to July 2008. [Id., at 15-18]. She also stated that newspaper articles about investigations and other problems with the business as well as rumors in the community that it was shutting down had led to business losses. [Id.]. Although Blue Ridge and the sheriff's department had previously had a good

working relationship,[8] sheriff's deputies would no longer sit with Blue Ridge staff at restaurants for fear of being fired. [Id., at 18].  One unidentified deputy sheriff reported to Baynard that Ashe told his deputies he was going to shut down Blue Ridge and put it out of business. [Id.].

Baynard identified three Blue Ridge employees with knowledge of the contract to sell the business to Hale who left Blue Ridge to go work for the Sheriff's Department. [Id., at 20].  She identified them as Blankenship, Rumsey and Clark. [Id.].  Clark told Baynard that he had spoken with a friend of his at the Sheriff's Department about Blue Ridge being sold. [Id., at 21].  Blankenship told Baynard that there was no need to sell the business because Ashe was going to shut it down. [Id., at 23-24].

Blankenship has provided an affidavit in which he stated it was common knowledge that Finn wanted to sell Blue Ridge but that he did not know the name of the individual interested in the purchase. [Doc. 11-1, at 1-2].  Blankenship also stated that in 2007, he did not discuss the sale with Ashe personally.  [Id.].

Rumsey provided an affidavit containing the same information although she also stated that she had not spoken with anyone else at the Sheriff's

---

[8]Indeed, in November 2003, Ashe had extolled the virtues of working closely with Blue Ridge which provided assistance to his deputies. [Doc. 59-12].

Department about the sale. [Doc. 11-2]. Blankenship limited his affidavit to discussions with Ashe and did not state whether he had discussed the sale with other deputy sheriffs. [Doc. 11-1]. Ben Clark provided an affidavit in which he made the same statements but, like Blankenship, limited his discussions to Ashe. [Doc. 11-3]. This evidence presents conflicting versions of the same factual scenario. While the issue is whether Ashe knew of the contract for the impending sale of the business, it is not necessary that the Plaintiffs show that he knew the contract was with Hale. While the Plaintiffs must show that Ashe induced the non-performance of the contract, a jury could reasonably conclude that Ashe's involvement in the regulatory investigations led to non-performance. Indeed, one reason given by Hale for the contract rescission was the investigations. Reasonable jurors could also conclude that Ashe intended to interfere in the completion of the contract to sell Blue Ridge and/or to interfere with existing customers' contracts.

During this period of Ashe's actions several of Plaintiff's contracts were terminated. In the fall of 2006, Golf Club Estates association terminated its contract with Blue Ridge. [Deposition Transcript of Mark Seifert, at 28-30]. At that time the president of the association, Tillery, was a member of SACCC. [Id.]. In the fall of 2006, Seifert filed a complaint against Blue Ridge with the

PPSB on behalf of SACCC.  On June 7, 2007, Southwestern Community College terminated its contract with Blue Ridge citing "an agreement with the Jackson County Sheriff's Office to provide law enforcement officers and coverage of our locations in Jackson County." [Doc. 13, at 29].  In August 2007, two contracts between Blue Ridge and homeowners' associations were terminated prematurely by the customers. [Doc. 13].  That same month, a contract with a local business was terminated. [Id.].  In December 2007, another homeowners' association prematurely terminated its contract with Blue Ridge. [Id.].  In February 2008, a fourth homeowners' association prematurely terminated their contract with  Blue Ridge and awarded the contract to a different company. [Id.].  This evidence is open to conflicting interpretations as to whether the contracts were terminated due to Ashe's open discussion at the meeting of pending complaints against Blue Ridge, the PPSB investigations and Ashe's role in providing the information behind those investigations.

There is also evidence from this period regarding incidents that a jury could reasonably find to be harassment of the Plaintiffs, and raising the question as to the Defendant's involvement in such harassment.  On Friday, July 6, 2007, Camille Bryan attended a birthday party at Mica's Restaurant in

Sapphire Valley. [Trial Transcript, at 1-6]. During a 911 call later than evening, she accused Finn of assaulting her but stated that she had not been injured. [Id., 64]. In that call, Bryan said that she had not been treated with respect but "it's not like I was injured or anything." [Id.]. The next week, she went before state magistrate Albert Reagan seeking a warrant to arrest Finn for assault. [Id., at 57]. He declined to issue a warrant. [Id., at 58]. Both before and after appearing before magistrate Reagan, Bryan spoke with Ashe about the incident. [Id.]. Bryan testified that Ashe called her and gave her the names of some attorneys, including Mark Seifert who ultimately represented her. [Id., at 66]. Six months later, a warrant charging Finn with assault was issued by a different state magistrate, Phyllis Wilson. [Id., at 58]. After trial, Finn was acquitted of the charge of assault.

In September 2007, Bryan Simon was convicted in the District Court for Jackson County of driving while impaired and obstructing an officer. [Id., at 75]. The officers involved in his arrest included members of Sapphire Valley. [Id.]. Simon accompanied Camille Bryan when she went to Magistrate Reagan to seek a warrant against Finn. [Id., at 77]. At that time, he met Seifert who also accompanied Bryan. [Id.; Deposition Transcript of Seifert, at 109].

The week after the July 6, 2007 incident, Seifert came into the bar at Mica's and told the bartender, Laura McAuley, that they had "a mutual friend." [Id., at 126]. McAuley asked him for identification but he did not give it to her. [Id.]. Instead, he asked if she remembered the incident involving Bryan from the previous Friday night. [Id.]. When she asked again for his identification, he left. [Id.]. During the assault trial of Finn at which McAuley testified, she identified the man who had visited her at the bar as Seifert and pointed him out as present in the courtroom. [Id., at 127].

Seifert admitted that he was "trying to shut down" Finn. [Deposition Transcript of Mark Seifert at 61, 103]. The evidence of Seifert's involvement in the attempted prosecutions further supports this. Reasonable jurors could find that Ashe's motive in referring clients to Seifert who would file complaints or charges against Finn was related to Finn's support of the proposed legislation. A jury could likewise draw the reasonable inference that Ashe had the intent to injure or interfere with Blue Ridge's existing customer contracts.

State magistrate Albert Reagan testified during his deposition that the week after the July 6, 2007 incident, Camille Bryan came to his office with her attorney, a male friend and deputy sheriff Steve Lillard. [Deposition Transcript of Albert Reagan, at 6-8]. Reagan declined to issue an arrest warrant. [Id., at

8-9]. After he did so, Ashe telephoned Reagan. [Id., at 9]. Ashe asked Reagan what probable cause issues had been missing. [Id., at 10]. Reagan answered the question but also told Ashe that he did not feel there was enough evidence to establish probable cause. [Id., at 10-11]. Reasonable jurors could see this as evidence that Ashe had the motive and intent to harm the business interests of the Plaintiffs.

Phyllis Wilson is a state magistrate in Jackson County, who testified during her deposition that she issued an arrest warrant for Finn after Camille Bryan came in to see her on January 16, 2008 accompanied by an assistant district attorney. [Deposition of Phyllis Wilson, at 1-15]. Wilson could not recall having had a telephone conversation with Ashe the night before. [Id.]. When she stated that she would prefer to have an attorney with her during the deposition, the examination was concluded. [Id.].

The forecast of evidence in this case shows that the factual issues, credibility determinations and inferences related to motive and intent make it inappropriate to dispose of this case on summary judgment.


**The Iissue of Qualified Immunity and the Motion to Stay.**

For the same reasons that summary judgment is inappropriate as to

each of the substantive causes of action, it is inappropriate as to the issue of qualified immunity for the §1983 claim. It is noteworthy that, in moving for summary judgment, the Defendants did not address the substantive law related to qualified immunity. Instead, the Defendants argued only that there is no evidence that Ashe violated any constitutional rights; thus, "no further inquiry" was required. [Doc. 12, at 25; Doc. 68, at 25].

"[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. In qualified immunity cases, this usually means adopting ... the plaintiff's version of the facts." Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008). In this case, however, the Court has found that it is a question for the jury whether the events occurred as posited by the Plaintiffs or the Defendants. Culosi, 596 F.3d at 201-02. For instance, if the jury finds that the Defendant acted in concert with Seifert to retaliate against the Plaintiffs for Finn's expressed support for the proposed legislation, then no qualified immunity would lie. There exist "in this case genuine disputes of material fact and [] the resolution of such disputes at trial [i]s necessary before the legal issue of [Ashe's] entitlement to qualified immunity [may] be determined." Landrum v. Bowens, 2010 WL 1452607 (4th Cir. 2010).

This conclusion also disposes of the Defendants' motion to stay pending an immediate appeal. If the Defendants are not entitled to appeal, a stay is futile and would only serve to delay this matter. A "defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Johnson v. Jones, 515 U.S. 304, 318, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). Such is the case here. In fact, the Defendants argue that the evidence presented by the Plaintiffs is "insufficient to support a conclusion that the official[s] engaged in the particular conduct alleged." Iko, 535 F.3d at 234, *quoting* Winfield v. Bass, 106 F.3d 525, 529 (4th Cir. 1997). That is not an appealable issue and thus, no stay is warranted. Iko, 535 F.3d at 234-35; Culosi, 596 F.3d at 201 (the Court of Appeals has no jurisdiction over a claim that the Plaintiffs have not shown enough evidence to prove that the Plaintiffs' version of the facts actually occurred); Landrum v. Bowens, 2010 WL 1452607 (4th Cir. 2010), *quoting* Culosi.

> If summary judgment was denied as to a particular claim solely because there is a genuine issue of material fact, that claim is not immediately appealable and [the Court of Appeals] lack[s] jurisdiction to consider it. If instead summary judgment was denied as to a particular claim because the officers were found, on the facts viewed most favorably to Plaintiffs, to have violated

[the Plaintiffs'] clearly established constitutional rights, that claim is properly before [the appellate court].

<u>Iko</u>, 535 F.3d at 235.  Lest there be any confusion as to this issue, the Court finds that summary judgment is inappropriate on the §1983 claim because there are genuine issues of material fact as to what actually occurred and the inferences to be drawn therefrom.  It is for the jury in this case to make that determination and only thereafter may there be a determination as a matter of law whether those facts violated a clearly established constitutional right. Based on this ruling, the Defendants may not appeal the denial of qualified immunity.  Therefore, there is no reason to stay this action.


## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants James M. Ashe and Jackson County Sheriff's Office's Motion for Stay of Proceedings Pending Appeal [Doc. 75] is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the Court's previous Order denying summary judgment is hereby amended as follows: the Defendants James M. Ashe and Jackson County Sheriff's Office's Motion for Summary Judgment [Doc. 11] is hereby **GRANTED** in part and the Plaintiffs' substantive due process claim is hereby **DISMISSED.**

38

**IT IS FURTHER ORDERED** that as to the remaining claims, the Defendants James M. Ashe and Jackson County Sheriff's Office's Motion for Summary Judgment [Doc. 11] is hereby **DENIED**.

**IT IS FURTHER ORDERED** that on or before five (5) business days from entry of this Order, the parties shall file response not to exceed five (5) double-spaced pages as to the issue of whether Jackson County should be substituted for Jackson County Sheriff's Office as the proper party defendant.

Signed: April 30, 2010

Martin Reidinger
United States District Judge